Case No. 15 of 5250, Muhammad Jawad, also known as Saki Bacha, Appellant v. Robert M. Gates, former Secretary of Defense at El. Mr. Montalvo for the Appellant, Mr. Yellen for the Appellant. Good morning. Good morning, Your Honor. My name is Eric Montalvo. I proudly represent Muhammad Jawad in this matter. I respectfully request two minutes rebuttal time. May it please the Court. In February of 2004, the Frequent Flyer Program was an authorized interrogation technique. It was authorized for a four-day period of time, required you to get permission from the JTF commander who was a flag officer, general officer. In March of 2004, Brigadier General Hood assumed command and ordered that the Frequent Flyer Program would be discontinued, no longer utilized. In May of 2004, personnel engaged in the Frequent Flyer Program for 14 consecutive days. They did not obtain permission from the JTF commander. As the military judge ruled in the matter, which is contained in the joint appendix, there was no legitimate interrogation purpose for this conduct. If we look at the definition of torture in the MCA under subsection 6, it clearly delineates what torture is and the conduct associated with this particular incident. This is the distinguishing factor in this particular case. Moving into the MCA, the first issue is there are two types of unlawful, or I apologize, there are two definitions of enemy combatant. Isn't there something that's more preliminary to all this? Isn't there a jurisdictional bar that you have to leap over? Yes, Your Honor. Could you address that issue? Yes, Your Honor. And that's where I was headed, Your Honor. Okay, sorry. So speaking first to 948 Delta. And so 948 Delta is the jurisdiction of the military commission. So the applicability of the MCA to Mohammed Jawad. So before we get to the back of the… How about our jurisdiction? How about if we deal with our jurisdiction first? Yes, Your Honor. But to determine if this court has jurisdiction, then we have to determine if these are the rules that we're playing by for Mohammed Jawad. What I'd like you to address is 2241E2, which bars these types of claims, quote, if the detainee has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination. Now, wasn't there a CSERT held here at which it was determined that Mr. Jawad was an enemy combatant? That took place, right? Viewing the issue in this case, Your Honor, and looking at enemy combatants defined in this MCA and looking at the different words around this particular statute, torture is considered prohibited conduct. And so when we're looking at the enemy combatant provision, there are two definitions of enemy combatant. One of them is lawful. The other one is unlawful. Well, let me ask you a question. Yes, sir. Wasn't there a CSERT determination that Mr. Jawad was properly detained as an enemy combatant? If we assume for purposes of this discussion that the CSRT in 2004 was a properly convened CSRT and would sustain under this regulation, then the court could potentially construe that that is the case. But it's our position that that was not a properly construed CSRT. It was not based in facts. If we look at, you know, Muhammad Jawad was never charged with perfidy. He was never charged with association with al Qaeda. He was never charged with association with Taliban. He was never charged with material terrorism support. So any determination, he was simply charged, allegedly charged, well, he was charged allegedly throwing a grenade. So where in the law of war do we get to an unlawful determination? Why are you focusing on unlawful? Because I think that's the question because the definitions you're dealing with in the statute, not on the jurisdictional statute but in the 10 U.S.C. provisions, you're focused on unlawful enemy combatants. And unlawful enemy combatants are germane to military commission jurisdiction. So I understand that because military commission jurisdiction may turn on the unlawful state of an enemy combatancy. But for purposes of this jurisdictional provision, enemy combatancy period seems to be the operative question for purposes of our jurisdiction. Yes, Your Honor. So there are two pieces in the enemy combatant. So as the statute defines, it's either lawful or unlawful. If he's considered lawful, then that would move him into the Uniform Code of Military Justice. So we're under a different set of rules if he was determined to be lawful. And so under the military rules in the Uniform Code of Military Justice, if you look to RCM 202, if he's under 17, they don't even have jurisdiction to even prosecute him. But Uniform Code of Military Justice, I mean, that's for courts martial and provisions like that and proceedings like that. But what we're talking about is just whether an enemy soldier has been determined to be such, to be an enemy combatant. And as Judge Griffith has pointed out, the jurisdictional provision that pertains to us, 28 U.S.C. 2241E2, turns on that determination of just enemy combatancy period, not unlawful enemy combatancy. Yes, Your Honor. So if you look under the provision, it says it also contemplates a prospective determination. And as we know from the case, in this case, there wasn't a determination in accordance with the MCA 2006. What subsequently happened was they did an AUMF determination and did determine him not to be detainable. So in that case – That was after three prior determinations that he was, right? We had the CSIRT and the two administrative review boards all said he's an enemy combatant. And then later, in the litigation strategy, and we'll ask the government what was going on with that, they say we no longer treat him as if he was detainable. But what we have in front of us is three determinations by the executive that he was detainable. And under our precedent, it seems like that's a bar. Under JANCO, it doesn't even have to be properly determined. They could get it wrong. But as long as they've made that determination, Congress has barred us from hearing this type of case. So in terms of the determination, looking at the subsection, it talks about – and in JANCO it talks about lawful types of activity. It contemplates that frequent flyer program was a proper use of interrogation technique, conditions of confinement that, you know, rations or, you know, noise interference or, you know, isolation. So when we're in JANCO, we're talking about things that are contemplated to be lawful. And in this particular case, we have something that is unlawful. As the military judge indicates, this is flagrant disregard. This is well beyond the pale. He even indicated that the persons who conducted this type of behavior should be held accountable. And so when you look at the construct of the MCA, it specifically determines what prohibited conduct is, and then you cannot read that into the next section that the court would be prohibited from jurisdiction over torture. But what is it about the jurisdictional provision 2241E2 that makes your points relevant? And the reason I ask is it seems to me that what Congress is intending to do with this provision is to say it's a jurisdiction stripping provision that says there shall meet no jurisdiction in our court, assuming the following things have happened. Without regard to whether the merits of your claim, you're making a passionate argument that you have a meritorious claim, that his treatment was unlawful, it violated precepts that should be applicable. But it seems to me the jurisdictional provision doesn't pin jurisdiction on whether you ultimately have a meritorious claim. It's antecedent to that, and it simply asks whether the person has been determined by the United States to have been properly detained as an enemy combatant. And if so, there's no jurisdiction. Yes, sir. My time has fallen below the two-minute mark. May I answer the question, Your Honor? Okay. So as it relates to, it says, any aspect of detention, transfer, treatment, trial, or conditions of confinement of an alien who was detained by the U.S. and is determined to be proper. So, again, what we're legislating here, what we're codifying, is lawful activity by the United States, things that have been authorized. If we look throughout Romany, if we look at Rasul, if we look at all of the different cases that form the lineage of this, we're looking at lawful activity by the U.S. government. And two, three pages before, we're talking about torture, and we're talking about prohibited conduct. So it does not reconcile that we would strip the court of jurisdiction over something that we know to be prohibited because then there's no remedy. It would make no sense. There's not a jurisdiction stripping of what we know, international treaties. We know what all the protocols, what all the cases have talked about, including the DTA, which preceded this. In the DTA, the Congress talked about and contemplated the fact that there may be actions against, you know, persons that may engage in torture. So I'll rest on that answer. Okay, great. We'll give you some time back. Good morning, Your Honors. May it please the Court. I'd like to begin by addressing the question that Judge Griffin asked about the nature of the notice that the United States filed in the habeas proceeding. Judge Griffin, your description was exactly correct. The decision by the United States government was to not treat Mr. Jawad as an enemy combatant, and that decision was a litigation-based decision. It wasn't a change in the executive's determination of Mr. Jawad's status. But how do we know that? I mean, the next sentence in the notice said that a determination was made by the Secretary. It's called a determination. Not to treat. The determination wasn't a change in the status. And I'd suggest two responses to Your Honor's question. The first is textual within the body of the notice itself. On page 82 of the joint appendix, the second page of the notice, the United States informed the district court that there were, let me get the exact quote here, multiple eyewitness accounts that were not previously available for inclusion in the habeas record. So that was part of the explanation for why, in the habeas case, the government had decided no longer to treat Mr. Jawad as an enemy combatant. The second thing I would say to Your Honor's question is, respectfully, this is a filing of the United States. It was a litigation document. And I believe the government is owed some deference in the interpretation of the meaning of its own document, especially when it's supported by other aspects of the filing, which suggests that there has been no change on the merits of the determination. Let me ask you, legal, is it your view of E2 that had there been a subsequent reversal of the initial determination? You're saying that the litigation strategy doesn't represent that. But had there been, what legal consequence would that have? I think that would present a more difficult question for this court. How would we think about that, Dan? So a couple of things I think I would say in response. First of all, it would very much depend on the nature of the determination. And what I mean by that is whether the determination was that the original determination was incorrect or whether the determination at the time had changed. So suppose we have a situation, not that says that from this point going forward, there's no longer grounds to detain the individual as an enemy combatant because, let's say, they've been rehabilitated, they pose no ongoing danger. Suppose it's not that. Suppose it's the worst-case scenario from the government's perspective, which is that based on information that we've now received, we realize that this individual was never detainable as an enemy combatant, even though there was a prior CSER determination that he was. Now, if you have that situation where the government comes forward and says, based on information that's come to our attention, this individual is never detainable as an enemy combatant, then would we have jurisdiction? I think that would be a much more difficult position for the government, and there would be a much stronger argument that this court does have jurisdiction. And the reason is because even though you could make the argument, actually, that the person was determined by the United States to have been properly detained, because by hypothesis there would have been an initial determination, but it seems to me that the effect of the second one is to annul the first one. So I don't want to foreclose entirely arguments that the government can make, but I think that there would be a reasonable analogy to a statute that said, something shall happen if the courts determine. One wouldn't think in the normal course that if the district court made a determination, that would be sufficient if a court of appeals later reversed the district courts. So your argument here is that the litigation position you took was not an unraveling of the prior decision? That's right. And I want to be very clear that I'm not conceding that even if it were the litigation decision, at that point where it changed, it would dispositively resolve this case. You're just saying there was no change in the determination? That's exactly right. And I think it's obvious on its face. The term was the United States would no longer treat Mr. Jawad as an enemy combatant. And as I referred earlier in my response to Judge Wilkins on page 82, there is additional evidence that the United States referred to the district court judge. I understand why you're being cautious here, but the language the statute does say has been determined. It makes it sound like as long as there is such a determination, game over, no jurisdiction. That's what one would argue a draconian approach to things, but that does seem to be the language of the statute. But you're not resting on that now. You're resting on that there was a determination that has never been reversed. Yes, because that's the easier basis, and I think the court doesn't need to go to the more complicated question. I'm being cautious precisely because it could be conceivably in a case where the government would have a strong interest in making what you're describing as the draconian interpretation. I do think, as Your Honor suggests, the text of the statute could support it. I just think that our position would be harder. Perhaps I could give what would be— But why, on an issue this important that everything turns on, shouldn't there be some jurisdictional discovery to see what the determination was? I mean, you've got a pleading, but the pleading is obtuse. No, well, again, Your Honor, I disagree respectfully that it's obtuse. It is absolutely clear that the government will no longer treat Mr. Jawad as an enemy combatant for purposes of the habeas case, that is, for the purposes of whether or not the United States would assert in habeas that Mr. Jawad is not entitled to the writ. Number two, as I suggested before, the very next page refers to additional eyewitness testimony as to Mr. Jawad's conduct on the battlefield. And number three, again, with all due respect, Your Honor— What do you mean by treat with habeas and how I'm supposed to understand that to necessarily mean that that's a different determination than the determination that is treated under the CSRT, which is also under the AUMF? The CSRT made a determination about Mr. Jawad's status. Is he an enemy combatant? Yes or no? The CSRT determined the answer to that question is yes. In the district court, in the habeas proceedings, the question was different. The question was not, is Mr. Jawad an enemy combatant? For the purposes of contesting or not contesting the writ, the government said, in light of litigation considerations, we will no longer press the argument that Mr. Jawad is an enemy combatant. But that does not say that the executive branch has revised its determination. It has just made a decision based on litigation considerations, evidentiary considerations, and the like. What if there's a memo that says we can't really prove that he's an enemy combatant and it was erroneous for us to say so because we've actually got new evidence that it was his brother that threw the grenade, not him? And so we're just going to, you know, fold on this and file something that says we're not going to treat him as an enemy combatant anymore for the purposes of habeas? Would that be completely consistent with this filing? No, it would not, Your Honor. On page 82 of the joint appendix, which I urge you to take a look at, the government refers to evidence that was not in the habeas record that includes eyewitness accounts of Mr. Jawad engaging in the behavior which was the basis for his detention. So it is abundantly clear that the point that the government was making in the district court was that there was evidence that it did not have an evidentiary record in the habeas proceeding to make its case, and so it decided, as a litigation strategy matter, not to treat Mr. Jawad as an enemy combatant. But it is, I contend, Your Honor, clear on the face of the filing that the government had not revised its decision about Mr. Jawad's status. I'd also like to make the following point, which I think is fairly important in understanding the question about revision of the government's determination, the United States' determination. There is no mechanism, there was no mechanism, for executive review of CSRT determinations. The CSRT made the only determination about enemy combatant status under the DTA and the MCA as it was enacted. The place for review of such a determination was this court. And in Aljanko, this court held that a grant of habeas or another judicial determination did not count as a determination by the United States. It was the executive branch's determination. And ARB's, Administrative Review Boards, as we explained at page 11, note 3 of our brief, do not sit in review of CSRT's. They make a current-time determination about whether continued detention is justified among other reasons. The CSRT's happen periodically, right? The CSRT's, my understanding is that they do not, that in the usual course it's usually so. And then ARB's would subsequently make the periodic determinations, what are now carried out by so-called PRB's. Although there must be occasions where that's not the case because the Ninth Circuit case, I can't remember the name of it, there were multiple CSRT's. And what I was going to suggest before is this case would be an even more difficult than the hypothetical we were considering earlier about the executive making a litigation decision on the merits. If a subsequent CSRT, or indeed if the very CSRT that made the determination two weeks later changed its mind, I think that would be the most difficult case for the government. But I want to stress that the nature of the proceedings, the CSRT's make the initial determination. There is no review of that. The only review was set up for this court. And it would actually be a quite perverse outcome, I believe, create perverse incentives if, as Algenco says, a grant of a habeas writ is not sufficient to undo the determination for the jurisdictional bar purposes. But if the government concedes the writ, that doesn't undo the jurisdictional bar. That would give an incentive for the government to litigate to the death every single habeas case rather than conceding the writ in an appropriate litigation posture that I suggest to your honors would be contrary to the United States interest and certainly contrary to the detainee's interest. What work does properly do in the statute? Properly modifies the determination that the CSRT has to make. But this court in Algenco emphasized that that does not mean that the determination has to be correct. The question is whether or not the CSRT, by its own standards, the standards that the CSRT applied, determined that the individual is properly detained. But again, Algenco, I think, has explicitly resolved the question that your honor is raising, that is, whether or not the correctness of the CSRT determination is at all relevant to the jurisdictional bar. How, I guess, are we to know or anybody to know whether the CSRT properly determined anything? With respect, your honor, so two answers. First of all, there was under the statutory scheme, this court had the ability to review CSRT determinations under the Detaining Treatment Act and under the Military Commissions Act. That process was effectively practically put to the side after Boumediene when direct habeas review became available. But the mechanism was for this court to engage in judicial review of the CSRT determinations. But the court in Algenco explained after Boumediene that the correctness of the CSRT determination is not an issue that's relevant to the jurisdictional bar. But the court said in explaining what properly meant, it cited to Barhoumi, if that's the correct pronunciation, and that was a case where we did review the CSRT determination and we reviewed it basically to see whether they had sufficient evidence and whether they applied the proper standard, the preponderance standard, and using a very deferential standard of review, we affirmed in essence the CSRT determination. So it would seem that in Algenco we were saying that properly means that the CSRT has to at least have sufficient evidence and apply the proper legal standard. For instance, the CSRT couldn't say, well, we don't have proper preponderance here, but there's probable cause to believe he's an enemy combatant, and so we're going to deem him to be such. You wouldn't contend that that's a proper determination, would you? So Judge Wilkins, Algenco is this court's precedent, and we'll wait to hear what the court says is the best understanding of it. But I read Algenco very differently. I read Algenco to go on to say that the correctness of the CSRT's determination is not at all relevant to the jurisdictional bar and that it is not the role of this court to evaluate the correctness of the CSRT's determination in deciding whether or not the jurisdictional bar precludes a damages action. But the court didn't say that proper meant nothing. I'm asking you what proper means. Proper means that the CSRT has to make a determination that an individual is determined as sorry, is detained as an enemy combatant. Then you don't need proper in the sentence if you're just saying that there has to be a determination. I agree that the word properly in the context of that sentence is a redundancy. Why? But the properly modifies detained, not determined in the statute, right? I don't think properly appears before determined. I think it appears before detained. You're quite right, Your Honor. You're quite right. It is determined to have been properly detained. So the question, as I understood it, is a CSRT is always making a determination as to whether the person is properly detained as an enemy combatant. Whether that determination is proper is a different question, but the word proper doesn't modify determined. It modifies detained. It modifies detained. That's exactly right, Your Honor. But how is it doing any work, even if it's modifying detained, if all it means is that the CSRT meets? I mean, if the CSRT group meets and there's no evidence that's presented at all, but they say this person, and we want to detain them as an enemy combatant, and we have no evidence, is that person being properly detained? Without any evidence presented to the CSRT, I would imagine, first of all, I appreciate that this is finding the hypothetical, but a CSRT would not make such a determination. If you're asking me to assume that the CSRT has made that determination, I would say if the CSRT would be making a determination that the individual was properly detained, it would be an incorrect determination. However, the correctness or incorrectness of that determination is not relevant to the jurisdiction so far. So I just want to make sure I understand your position as we try to interpret this statute. Your position is that if, hypothetically, the CSRT is decided without any evidence whatsoever to find that this person is properly detained, and then they later brought suit, we would not have jurisdiction because that determination has been made. I believe Aljanko expressly holds that, Your Honor. So, in short, yes. And you think that's compelled by the plain language? I do, and this Court said as much in Aljanko. And what did we mean then when we said, when we cited, I mean, what was the whole purpose of citing Barhomey then? My recollection, and I'm pulling up the case right now, does Your Honor have a page citation for me to look at? My recollection is that the Barhomey... 144. Thank you, Your Honor. The Court said, the phrase properly detained as an enemy combatant identifies the type of determination the executive branch must make. V is a determination that the detainee meets the AUMF's criteria for enemy combatant status, C, E, G, Barhomey. Right, and then, Your Honor, it goes on to say in the very next sentence after the parenthetical, but the statute does not say that the bar applies to an alien whom the United States has properly determined to have been properly detained as an enemy combatant. It requires only that the executive branch determine that the AUMF authorizes the alien's detention without regard to the determination's correctness. I think that's dispositive, and I think that, as I was going to suggest a moment ago, the citation and the discussion of Barhomey was to contrast the inquiry that the Court is required to make under the jurisdictional provision. But wasn't it talking about correctness in the sense of correct, then called review by a court? I'm sorry, I'm not following your question, Your Honor. I mean, Algenco was a case where a habeas court later found that the executive's decision was incorrect. That's right, and nevertheless, Algenco held that the individual could not bring a damages action. So why doesn't correctness in this, at page 144, when they say without regard to the determination's correctness, meaning without regard if we find it to be incorrect on habeas later, why should we stretch that language to mean that even if they didn't follow their own procedures, it's still a determination that Congress intended in this statute to use to deprive the courts of jurisdiction? So, Your Honor, I think this is a lesser included. That is, if even on grant of habeas, where the correctness or incorrectness is judicially determined, where the executive, especially in the context of a case like this, has not made any revision to its determination, I just think that it comes with it. And I guess I'd like to stress it would create quite perverse incentives for the Court to hold, as in Algenco, that damages are precluded once a court grants habeas, but not if the executive declines to pursue the habeas case, because that would give the executive incentive to litigate every habeas action to the bitter end rather than concede the writ and allow for the liberation of the, or the release, I should say, of the detainee. That would not be consistent with the detainee's interests or the government's interests, and it can't be what Congress intended. Okay, so the CSRT meets and, without any evidence, declares someone to be an enemy combatant. A whistleblower inside the military advises the President that that has happened. The President reviews the case and says, Release this person immediately. There's no evidence that he's an enemy combatant. The people at the base are upset that this person's going to be released, and they beat him half to death, and he sues in this court. We don't have jurisdiction because the CSRT made a determination. I think that, Your Honor, gets closer to the prior hypotheticals we were discussing. If the President of the United States makes a determination that the individual was not an enemy combatant on the merits, I think that is a much more difficult case for the government. I would not want to concede that the jurisdictional bar is not applicable for the reasons that I discussed in the colloquy with Judge Griffith, but I do agree that it would be a much more difficult case because that would at least be an action by the executive with a capital E that the individual was not an enemy combatant. That is, with respect, I appreciate it's a hypothetical to test principles, but that's quite, quite far from this case where we have... I understand it's quite far from this case, but you're asking us to construe the statute to mean that essentially proper means nothing. No, with respect, Your Honor, I'm asking... As long as there's a determination, then that's all that we need. With respect, Your Honor, I'm asking the court to do nothing more than it has already done in Aljanko. This precise issue is one that, given the facts of this case, this case comes squarely within the rule this court has already laid down in Aljanko. Well, if our rationale were to also be so sweeping that it would take in the hypothetical that Judge Wilkins offers, then we'd be doing more. Agreed. So I think the question is the statute doesn't speak in terms of CSER. The statute speaks in terms of determinations by the United States. Yes, Your Honor. And so the question, I think, that the hypotheticals that we're bandying about, including the one that Judge Wilkins poses, is if there's been a determination by the United States that the person's properly detained as an enemy combatant and then the subsequent determination by the United States that the person's not properly detained as an enemy combatant, then what do we do with the statute? Because the statute tells us if you have been determined to have been properly detained, then there's no jurisdiction. But the negative thing to that would seem to me to be that if there's a determination that you're not properly detained as an enemy combatant, then there is jurisdiction. And so we get into all these questions about sequencing, which determination came first, which determination came second, but those cases all presuppose a situation in which there's been both a determination by the United States that the person is properly detained as an enemy combatant and a determination by the United States that the person is not properly detained as an enemy combatant. And I take it your position in this case is you don't have the second of those here, and we don't have to treat with what happens in that situation because this case deals with the situation in which there was a determination by the United States that the person is properly detained as an enemy combatant and no subsequent action that calls that into question. That's exactly right, Your Honor, and that's the reason why I'm not able, on behalf of the United States, to take a firm position in light of the hypotheticals. If we have a case that presents that, we would be forced to grapple with the difficult issues. And I think that to the extent that the court has concern about a subsequent revision by the executive branch, it could expressly leave that question open for consideration in the next case. Thank you very much. Mr. Montalvo, we'll give you two minutes back. May it please the Court, I want to direct a couple of things. First of all, in terms of hypotheticals, I represented Mohammed Jawad during the military commissions as well as during the habeas proceedings. And so I was the person who went to Afghanistan, I was the one who vetted the facts, and I briefed the DOJ on these issues. The new facts and circumstances that the government alleges in their pleading were not new. Judge Huvel gave the government an opportunity to say, when did you get this new information, where did you get this new information, present that to me, otherwise he's going to be released. And they were unable to do that because when they realized that the left hand wasn't talking with the right hand, there was no new information. And the key pieces of information were three things, the alleged confession written and two eyewitness accounts. One was a police officer in Kabul who allegedly detained Jawad. That could not happen because there was another witness that said he's the one who allegedly detained Jawad. The police officer, if you look at the facts, if somebody would have actually looked at the facts, the police officer alleged that the crime happened in a different location than the alleged incident even occurred. So that was the first piece. The second piece was the alleged tomato vendor that allegedly detained Jawad wasn't even physically located where the incident occurred. That was the second thing they had to look at. And the third thing that the government had to consider was that this alleged confession was done with a gun to Jawad's head in a language that he did not understand. So taking your argument is that, in fact, there was a later determination by the United States. That's correct, Your Honor. And they had these facts in full view before they made that determination because the sequence of events was they were briefed on the facts, they actually had to look at the case and consider the matters before it, and then they made that determination. He was in the middle of a military commission's prosecution. It would not make sense if there were facts that demonstrated that he did what he was alleged to have done for the court to say that he was not properly detainable. There's no basis. Why would the court subsequently say he's not detainable if the facts and circumstances met the minimal threshold for that detention? I thought the reason that the other evidence was invoked in argument today is not necessarily to say that the other evidence is, in fact, probative and shows that he was being properly detained or that he should have been charged for these actions, but it was just meant to shed light on the statement that we'll no longer treat petitioner as detainable because if there's a document that says on one hand we will no longer treat this individual as detainable and then on the other hand cites evidence which may, let's just assume you're right, and it has been there all along, but it nonetheless invokes evidence that says then this evidence can be the subject of subsequent criminal investigation. Then it sheds light on what treatable means because it tends to bolster the notion that it's a litigation-related judgment rather than a substantive determination that the person was never detainable as an enemy combatant to begin with. As a hypothetical, I understand, Your Honor, but in reality what happened is that did not occur. This wasn't a litigation strategy. The government was visceral and aggressive about trying to figure out a way to prosecute Muhammad Jawad. They even expressed during court argument that they were intending on potentially prosecuting him in New York and going through whatever and that this new evidence would potentially give them the ability to do so. So there was never a position that the government was taking that they were not trying to prosecute Muhammad Jawad. What they conceded on is when they realized that when they actually looked at the record, they realized that they had nothing. There was nothing in that record that substantiated any of the allegations against him, and so that was the determination that he was no longer detainable. They did not have a basis for it. Did you seek any discovery of what the determination was that was actually made, or did you just, you know, accept the fact that they were conceding the habeas and your client was going to be released and you wanted to get out of there? Well, there were two separate issues going on. We had the commissions, Your Honor, and then we had the habeas. And as to the habeas, Judge Hovell ordered the government to produce that information. So we didn't have to undertake in any discovery. She directed the government, if they had information that substantiated their basis, to bring that forward to the court and she would evaluate that. So we didn't have to undertake discovery on that issue, Your Honor. It was presented. And as to the commissions, the only reason we got to habeas is because President Obama stayed the commissions process, which led to a potential indefinite detention issue. And so we had not yet arrived at the AUMF issue, which is a joint appendix. The military judge was explaining this determination has not yet been made and needs to be made, and it will be made prior to going to trial on the merits. And so that's where we sort of leave it because he suppressed the statements and then a further determination was to be made. Well, what about the fact that the government says that we should defer to their explanation as to what their notice means and that we don't want to create a disincentive for the government to concede the habeas relief if that's going to perhaps open the government up for litigation afterwards? So as applied to this case and as applied to the idea of torture, the issue is that, you know, the MCA tries to take away jurisdiction for two reasons. One, habeas, it says the court can't go there, and two, on this torture issue. And so if there's no effect to the determinations, it would be meaningless. It's the exception that swallows the rule. If there's no analysis that's to be conducted in any of these words or meaning, it's basically because we had them, it was okay, and that's the end of the inquiry. There's no judicial oversight. And so within the statute, we can't read that. We're talking about prohibited conduct. We're talking about accountability. We're talking about don't do this, don't do that. And we're saying at the same time that we're going to strip the court of, you know, reviewing these actions with no consequence. So we're effectively saying that torture is endorsed and approved and protected under all circumstances and that the court should never reach in to evaluate that determination. We believe that improper. Okay. Thank you very much. The case is submitted.
judges: Griffith, Srinivasan, Wilkins